[No. 2838. Jan. 3, 1927.]

Rehearing Denied June 28, 1927.

CALVERT v. JOSEPH et al.

[257 Pac. 680.]

### SYLLABUS BY THE COURT

1. An executory land contract having been rescinded at the purchaser's suit, and he being entitled to recover what he had paid, consisting largely of his notes secured by collateral, which notes and collateral have passed into the hands of innocent third parties, a decree is equitable which fixes the amount of recovery as the face of the notes with provision for credit for such thereof as may be delivered up with their collateral.

2. Equity will not consider a vendee of land in default for interest, if, previously, the vendor has converted a larger

[1] 38 Cyc p. 2097 n. 71; 39 Cyc p. 2072 n. 23 New. [2] 39 Cyc. p. 1570 n. 36 New. [3] 39 Cyc p. 2002 n. 42; p. 2047 n. 55 New.

sum of the vendee's funds.

3. Vendee of land may accept the vendor's wrongful declaration of forfeiture as an abandonment of the contract, in which case he may recover his payments, as upon a mutual rescission, and his right to restitution is not defeated by his failure to tender interest due under the contract.

Appeal from District Court, Taos County; Leib, Judge.

Action by Simon P. Calvert against Elizabeth F. Joseph and others to cancel a land sale contract and to recover payments thereon. From the judgment, defendants Joseph appeal. Affirmed and remanded, with direction.

J. O. Seth, W. J. Barker, and Renehan & Gilbert, all of Santa Fe, for appellants.

L. F. Twitchell and J. H. Burkhardt, both of Denver, Colo., John I. Palmer, of Saguache, Colo., J. J. Kenney, of Santa Fe, and William McKean, of Taos, for appellee.

OPINION OF THE COURT

WATSON, J. [1] This litigation grows out of a contract dated June 8, 1920, whereby Elizabeth F. Joseph, Antonio F. Joseph and Angela L. Joseph, Antonio's wife, agreed to sell to J. J. Handley and Simon P. Calvert the Ojo Caliente Springs property, consisting of about 1,300 acres of land and a hotel. The consdieration named was $150,000, of which $59,457 was acknowledged to have been paid. It was recited that the vendees had received possession and that the vendors had executed a deed. It was agreed that the deed should be delivered in escrow to the Capital City Bank of Santa Fe, and should be by it delivered to the vendees whenever, on or before June 8, 1930, the vendees should have paid the sum of $90,533, with interest thereon at 6 per cent., payable December 15, 1920, and semiannually thereafter. The vendors agreed to pay forthwith the taxes accrued up to and including 1919, and to pay off all mortgages and incumbrances then outstanding on or before June 8, 1930; the vendees

also having the right to pay off such incumbrances at any time and to have credit for such payments. It was provided that, in case of default by the vendees in any covenant or condition of the agreement, they should immediately deliver quiet and peaceable possession of the premises, and that time should be the essence of the contract, and that, in case of failure of the vendees to fulfill any condition or covenant of the agreement, the vendors might, at their option, declare the agreement canceled and the rights of the vendees forfeited, and might enter upon and take possession of the premises, and that all payments made and all improvements placed thereon and all personal property therein should be forfeited to the vendors as liquidated damages. The contract was executed by J. J. Handley for himself and as attorney in fact for Calvert, and by Antonio F. Joseph for himself and as attorney in fact for the other vendors.

This suit was commenced by Calvert against Handley, the three Josephs, and certain other defendants, for the purpose of cancelling the contract and recovering what had been paid thereon. Judgment was rendered against Handley by default and against the other defendants after trial; only the defendants Joseph appealing.

The facts found by the trial court, freely rendered, are as follows: Antonio F. Joseph at all times was the duly authorized agent and attorney in fact for defendants Elizabeth F. Joseph, his mother, and Angela L. Joseph, his wife. Handley, who had an agreement with Joseph for a 5 per cent. commission if he should sell the Ojo Caliente property for $150,000, proposed to Calvert, with Joseph's knowledge, that they—Handley and Calvert—buy the same together and operate it as partners. While thus posing as a prospective partner, with interests identical with Calvert's, Handley really had no bona fide interest in the purchase, was unable to contribute substantially thereto, and was, in fact, working in concert with Joseph to effect the sale.

Calvert was 76 years of age, had spent his life in the cattle business, from which he had just retired, and was "almost without capacity, because of the depreciation caused by age and infirmities to make a contract of any kind," and these facts were known to Joseph. The sale price of the property "was an exceedingly large price for the same, and very largely in excess of any reasonable valuation thereof."

Negotiations among Joseph, Handley, and Calvert progressed to an understanding, which, as we may infer, is correctly represented by the written contract made, except in these particulars: (a) The sale was to include the personal property, commissary, and supplies situated on the premises, but this was not included in the contract; (b) interest on deferred payments was to be paid annually, while the contract made it payable semiannually; (c) a strict forfeiture clause, such as was inserted in the contract and afterwards invoked, was not contemplated.

Having reached this understanding, Joseph and Handley represented to Calvert that some one must go to Santa Fe to examine the title, and that it would expedite matters if Handley were armed with power of attorney to act for Calvert. They thus prevailed upon him to clothe Handley with power—

"to sign all papers in regard to deal now pending re of Springs, * * * to sign my name to three notes of $10,000 each, with the full understanding that these notes are to be secured by notes of like amount due in the years of 1926, 1927, 1928, and are signed by E. B. Noland and Gordon Gotthelf * * * above-mentioned notes that I am putting up as security are in the Saguache County Bank. * * * Also further understood that any further papers in regard to the above-mentioned deal are also to be signed, where my signature is needed, by J. J. Handley, of Ojo Caliente, N. M., and that same signature will be as binding as if same were signed by me personally."

By virtue of this power, Joseph and Handley, at Santa Fe, in the absence of Calvert, prepared the written contract and executed it; Calvert himself never having seen it until December 20, 1920.

The sum of $59,467, acknowledged in the contract

to have been paid, was largely made up as follows: Three notes of $10,000 each, executed by Handley for himself and as attorney in fact for Calvert, payable, respectively, on June 8, of the years 1926, 1927, and 1928, with annual interest at 8 per cent., each of these three notes being secured by a $9,250 note given by the Calvert Cattle Company to Calvert; a $7,000 note and a $10,000 note, signed by Calvert and Handley, payable to Jesse Boothe, maturing, respectively, on June 4 in the years 1921 and 1922, with annual interest at 8 per cent.—these notes being secured by two $9,250 Calvert Cattle Company notes; a $3,000 note, due one year after date, with 8 per cent. interest, with Handley as principal and Calvert as surety, Calvert's signature being by Handley as attorney in fact; and Handley's $7,500 commission. The notes made payable to Boothe were, according to agreement, the consideration for which Boothe surrendered to the Josephs a contract which he had with them at the time for the purchase of an undivided half interest in the property.

About September following this, on the representation that he would use them for the purpose of paying delinquent taxes and outstanding incumbrances on the property, Joseph obtained from Calvert two additional notes of $9,250 each, maturing, respectively, on June 8 of the years 1931 and 1932, with annual interest at 8 per cent., and, as collateral, obtained two $9,250 Calvert Cattle Company notes, payable, respectively, on March 1, in the years 1930 and 1931, with 6 per cent. annual interest. Joseph had no intention of so applying these notes, but did in fact at once dispose of them, together with two of the $10,000 notes and their collateral, receiving therefor property in Denver of the value of $15,000 and $10,500 in cash. All of the Calvert Cattle Company notes thus used as collateral were Calvert's sole property.

About December 15, 1920, a check given to Joseph by Handley for the semiannual interest was dishonored, and Handley immediately disappeared, and

his whereabouts has since been unknown to all parties. On December 20, 1920, because of this breach in the condition of the contract, Joseph took possession of the property, thereafter retained it, declared a forfeiture of all payments made, and, on January 22, 1921, entered into a contract to sell it to other parties. On December 20, when the forfeiture was declared, Joseph had not paid the delinquent taxes nor the incumbrances, and had in his hands, belonging to Calvert, more than enough money to pay all that was due on the contract. By this finding it was undoubtedly meant that the two notes, which Joseph had disposed of contrary to his agreement, amounted to more than the interest due on December 15.

Upon these findings the court rests conclusions of law upon which the judgment is based. An analysis of these conclusions shows two main propositions: First, that Joseph had no right in equity to exact or declare a forfeiture, and that, by doing so, he became bound in equity and good conscience to return what had been received from Calvert, and Calvert, on his part, might rightfully treat the contract as rescinded and demand a restitution of payments; second, that the misrepresentation and fraud of Joseph and Handley was such as entitled Calvert, in equity, to a cancellation, and to be placed in statu quo ante. The first main proposition seems to be based upon two theories: First, that Joseph had no right to declare a forfeiture because he was himself, at the time, in default; second, that Joseph had no right to declare the forfeiture because the provision for such forfeiture, construed as liquidated damages, was itself an unconscionable provision which equity would not enforce. Thus we find the judgment standing upon three theories. If any one of them is correct, we need not inquire further.

We do not understand appellant's counsel to question the sufficiency of the findings to support the conclusions stated. Their attack is upon the sufficiency of the evidence to support the findings. Most of the

argued propositions relate to the fraud theory. This suggests the wisdom of considering the other theory first.

Appellee urges that a vendor, himself in default, has no right to rescind. He cites Fairchild v. Southern Refining Co., 158 Cal. 264, 110 P. 951; Provident Loan & Trust Co. v. McIntosh, 68 Kan. 452, 75 P. 498, 1 Ann. Cas. 906; Mason v. Edward Thompson Co., 94 Minn. 472, 103 N. W. 507; Norris v. Letchworth, 167 Mo. App. 553, 152 S. W. 421; Higginbotham v. Frock, 48 Or. 129, 83 P. 536, 120 Am. St. Rep. 796; 27 R. C. L. Title, "Vendor and Purchaser," 867. He next contends that if a vendor rescinds wrongfully, the vendee may accept the rescission and sue to recover the consideration already paid. He cites Maffet v. Or. & Cal. R. R. Co., 46 Or. 443, 80 P. 489; Smith v. Treat, 234 Ill. 552, 85 N E. 289; Seiberling v. Lewis, 93 Ill. App. 549; O'Brien v. Quirk, 204 Ill. App. 448; Cornely v. Campbell, 95 Or. 345, 186 P. 563, 187 P. 1103; Gibson v. Rouse, 81 Wash. 102, 142 P. 464.

These legal propositions are not questioned by appellants. Their contentions are: First, that appellants were not themselves in default, that the two notes obtained in September were credited on the contract, and that the court erred in refusing so to find; and second, that no forfeiture was in fact declared, and that the court's finding to the contrary is not supported by substantial evidence.

We cannot see how a finding that the two notes obtained from Calvert in September were credited upon the unpaid balance would have been material. Joseph obtained $18,500 of that balance long before it was due, upon the condition that it should be used in paying taxes, which his contract obligated him to pay "forthwith," and incumbrances, which his contract obligated him to pay ultimately, and permitted Calvert to pay at any time and receive credit for. The fact that he did credit the amount would not relieve

him from the duty of performing the condition. Whatever he did with the notes or their proceeds, Calvert was entitled to credit therefor.

Appellants contend that the evidence shows that:

"Instead of declaring forfeiture and terminating the agreement, Joseph desired the payment of the interest and the continuation of the contract. He was perfectly willing to give him (Calvert) time to raise the money and was desirous of continuing the contract with Calvert alone, eliminating Handley."

A part of this contention is true. Joseph did offer Calvert time to pay the interest, and did offer to make a new contract with him alone, on the same terms, provided Calvert would pay certain expenses, including attorney's fees and the cost of Joseph's trip from Denver. The evidence leaves no doubt, however, that Joseph came to the Springs from Denver on December 20, 1920, with the intention of declaring a forfeiture and of taking possession. He had with him a written notice to surrender, which he told Calvert he would have the sheriff read to him if necessary. He was in virtual possession and in active authority from that date. On that date he wired the Capital City Bank, which held the escrow, that the contract had been broken by nonpayment of interest and directed the bank:

"Deliver my deeds to no one."

On December 21, he wired the bank:

"Mail deeds care of the First National Bank of Taos registered."

On December 24, he wired:

"Handley has issued thousands of dollars of bad checks, left the country, last report was suicide. Send me deeds at once."

On December 31, he wrote the bank:

"I beg to advise that you are laying yourself liable, by not returning my deeds, as you know instructions to your bank were very clear; you also know interest was not paid as same was to be paid at your bank. I have many other reasons for breaking this contract; simply wish to advise you that you are causing me much damage by not

sending these deeds to me by registered mail as by wired instructions; of course, if you will not pay attention to same, you become liable for any and all damages that I may suffer in the near future.''

On January 18, Attorney Edwards wrote the bank:

''In behalf of Elizabeth F. Joseph, Antonio F. Joseph, and wife, you are hereby notified that J. J. Handley and S. P. Calvert have defaulted in the payment due the above-named Joseph under the contract of June 8, 1920, between 'said parties.

"Under the terms of the escrow instructions under which a deed from the Josephs to Handley and Calvert was deposited with you, upon such default the deed was to be returned to the Josephs. You are requested, therefore, to return the said deed to the Josephs, or, if you prefer, I will call for and receipt to you for it as attorney for the Josephs.''

The fact that Joseph was willing, and offered, to make a new contract with Calvert on conditions does not weaken the showing that he had declared a forfeiture of the contract subsisting with Calvert and Handley. It is plain to us that he took advantage of the forfeiture clause in the contract to force Calvert into a new contract, in which he would be solely, rather than jointly, liable; and we are quite satisfied that the court's finding of a declared forfeiture is correct.

Another consideration seems to us to lead to the same result. It is unquestioned that on January 22, 1921, Joseph assumed to enter into a contract for the sale of this property to new purchasers. Clearly, by that time, he considered the forfeiture effected and himself capable of giving possession. There had been no change in the situation with respect to default in payment of taxes and incumbrances, There had been no restitution of the $18,500 obtained from Calvert for that purpose. No new ground of forfeiture had intervened. Hence Joseph was in no better situation to enforce forfeiture on January 22 than he had been on December 20. We do not see how it could help appellants even if they could show that no forfeiture was declared on December 20, so long as they must admit it to have been effected on or before January

22.

We hold, therefore, that the lower court. properly awarded cancellation and restitution on the theory that appellants attempted to rescind the contract when they were themselves in default. It is unnecessary to consider whether, if appellants had not been in default, equity would have permitted them to enforce the attempted forfeiture. It is also unnecessary to determine whether the evidence supports the findings of fraud in the procuring and making of the contract.

The court made an accounting of what appellants had received under the contract; decreed that they were indebted to appellee in that amount; made the indebtedness a lien on the property; and decreed a foreclosure of the lien and the sale of the property for such indebtedness. In determining the amount, the court charged the appellants with the face value of the notes, but provided that full credit should be given for any of such notes delivered by appellants to appellee within 90 days from the date of the decree. Appellants complain of this as inequitable. They claim that the evidence shows that the notes were worth not more than 60 per cent. of their face, and point out that Joseph actually realized for $38,500 par value of them but $25,500 in cash and property. They invoke the principle that where equity requires a party to be placed in statu quo, the property to be restored, if it has passed beyond the control of the party so that he cannot return it, is to be represented by damages amounting to the value of the property at the time the duty arose to make restitution, regardless of the valuation which may have been placed upon it in the trade. That is all very well, when the property to be restored is land having an ascertainable market value. The cases cited by appellants involve such a situation. Blahink v. Small Farms Imp. Co., 181 Cal. 379, 184 P. 661; McGowan v. Burg Bros., 59 Cal. App. 219, 210 P. 545; Forrest v. Wardman, 40 App. D. C. 520. But this is not such a

case.

We fully appreciate the hardship of requiring appellants to make good a greatly larger sum than they have enjoyed. Yet, if we do not, we must contemplate a large loss to appellee when he is compelled to pay his notes. We cannot presume that he could settle his obligations for less than their face merely because appellants were willing to dispose of them for less. He is entitled to be placed in statu quo. That requires that he have his notes back, or the means to pay them. Nothing less will satisfy equity. If these notes are, in fact, worth less than par, appellants can buy them in and restore them as cheaply as appellee can settle them. This the decree permits. We do not see how the court could have done more for appellants or less for appellee. Facing probable loss to one of the parties, the court properly imposed it upon the wrongdoers.

"It is no obstacle to the rescission of the contract that such (the) wrongdoer is unable to return the specific property, for in such cases he may be required to account for its value or for the value of so much of it as he has parted with." Black on rescission and Cancellation, § 627.

"In an action by the maker of a negotiable promissory note against one who has wrongfully negotiated it, so as to render the maker liable upon it, the measure of damages is the amount of the note, and proof that the plaintiff has already paid the note is unnecessary." Sedgwick on Damages (9th Ed.) § 708.

"The maker of a promissory note can maintain an action for its conversion against one who, before it has any legal inception, wrongfully negotiates it to a bona fide holder for value. He is entitled to recover the full amount without averring or proving that he has paid it to the holder. It is sufficient that he is legally liable to pay it." Sutherland on Damages (4th Ed.) § 1132.

We can see no difference, to affect the rule of damages, whether the negotiation of the note was wrongful, or whether by his own act the payee, after having negotiated it, is in a position requiring that he return it.

Appellants cite Southeastern Land Co. v. Jonnard, 198 Ky. 504, 249 S. W. 789. There it was held that, in rendering judgment for the face of $10,000 of unsecured notes given as part of the consideration, and which could not be canceled because held by innocent third parties, there should have been a stay of its enforcement by execution or otherwise, to operate until the notes were paid by the plaintiff. We do not question the correctness of that decision. It was concerned with short-time notes, and, so far as the report indicates, no lien was decreed. The notes in the case at bar were not to mature for many years. It is not questioned that the amount to be restored was properly made a lien on the property. It would have been impracticable and probably against the interest of all concerned to have continued the lien until the notes should mature. It would not have been restitution. In any event, we do not understand that any such decree was suggested to the trial court. We are satisfied that the decree, in the matter of the accounting and its provisions for restitution, is equitable. Doherty & Co. v. Steele, 71 Colo. 33, 204 P. 77; Metropolitan Elevated Ry. Co. v. Kneeland et al., 120 N. Y. 134, 24 N. E. 381, 8 L. R. A. 253, 17 Am. St. Rep. 619.

One other contention is made by appellant. It has to do with the admission of evidence, but as it has no bearing upon the theory upon which we sustain the decree, it will be unnecessary to consider it.

It follows that the judgment should be affirmed and the cause remanded with direction to enforce it, and it is so ordered.

PARKER, C. J., and BICKLEY, J., concur.

On Motion for Rehearing.

WATSON, J. We placed the decision on two legal propositions, which appellee urged and which appellants did not question. They are: (1) That "a vendor, himself in default, has no right to rescind;" and (2) that "if a vendor rescinds wrongfully the vendee may accept the rescission and sue to recover the consideration already paid."

[2] Appellants moving for a rehearing, say that the foregoing are correct as abstract propositions, but not applicable to this case because of another proposition which we must have overlooked; viz., that neither vendor nor vendee, in default, may have rescission. They urge that appellee, the vendee, being in default for 6 months interest, could not rescind for the same reason that appellants, in default, could not do so. We may admit, as an abstract proposition, that a vendee in default is in no better position to demand rescission than a vendor in default. Yet we cannot sustain the contention as applied to this case.

It was the view of the trial court, undoubtedly, that appellee was not in fact in default. Our approval of this theory is made fairly clear by the opinion. The reason is that, in September preceding the interest maturity in December, appellants misapplied and converted of appellee's money several times the amount of the interest. It would seem absurd in a court of equity, where the doctrine of set-off had its origin, to hold that appellee, under such circumstances, was under a duty to pay the interest or in default for failure to do so.

[3] Attention now being directed to the point, we notice some confusion of terms in our original statement. Appellants, strictly speaking, did not claim the right to rescind. They claimed the more drastic right to declare a forfeiture. Appellee was not in the position of claiming the right to rescind because of appellants' default. In such a case it might have been necessary for him to tender the interest. He was in

the position of taking advantage of appellants' attempt to forfeit, as an abandonment of the contract. Acceptance of such an abandonment amounts to a mutual rescission. So the cited decisions hold. In those cases the vendee was in default as to payments, but the vendor had waived the default by conduct, or, because of default of his own, was not in position to take advantage of it. If, under such circumstances, the vendor attempts forfeiture, the vendee, without offer to pay what is due under the contract, may claim a mutual rescission and have restitution. So considering, it would be illogical to require the vendee to tender performance before demanding restitution. The purpose of tender is to put the opposite party in the position of having violated the contract. He is already in that position. Of course if such a tender were rejected, it would be a harmless form. But it might be accepted. That would lead to complications readily to be perceived. The vendee's default in payment is no default, within the principle invoked, if, for some reason, the vendor is not in position to take advantage of it. Such is the situation here.

The motion will be overruled.

PARKER and BICKLEY, JJ., concur.